FRANK BRACKEN v. THE STATE.

No. 15222.  Delivered May 11, 1932.
Rehearing Denied June 22, 1932.
Reported in 51 S. W. (2d) 379.

The opinion states the case.

*Adams & Jones,* of Gainesville, and *Hughes & Monroe,* of Dallas, for appellant.

*William C. Culp,* County Attorney, and *John W. Culp,* State's Special Attorney, both of Gainesville, and *Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

CHRISTIAN, JUDGE.—The offense is murder; the punishment, confinement in the penitentiary for ninety-nine years.

It was charged in the indictment that appellant, with malice aforethought, killed Bill Johns by shooting him with a shotgun.

Deceased was a police officer in the city of Gainesville and had occupied that position for some time. A few days prior to the homicide deceased and Walter Clements, another police officer, were advised that appellant was trying to get into the house of a negro woman with a shotgun. They instituted a search for appellant, but were unable to find him. Seeing a shotgun in appellant's car, which was parked on a street in the city of Gainesville, they took the gun and later arrested appellant.

At the time of his arrest, according to the testimony of state's witnesses, appellant was drunk. Appellant was placed in jail by the officers, and not released until the morning following his arrest. Prior to his release he was tried and convicted of drunkenness.

Touching the facts and circumstances immediately surrounding the homicide, the testimony of state's witnesses was as follows: After his release from jail appellant went to deceased and Walter Clements and endeavored to make them carry his gun back and put it in his car. The officers offered to deliver appellant's gun to him, but declined to take it back to his car. About an hour before the homicide appellant again went to the officers at the city hall and demanded that they place his gun back in his car. Clements got the gun and offered it to appellant, but appellant refused to take it. Appellant told the officers that they would take his gun back "or that he would get his work in and that it would be on the quiet and in the dark" and when no one saw him. The officers endeavored to persuade appellant to behave himself, and again offered him his gun. An hour later deceased was riding on a street in the city of Gainesville when he was called by one Timmis. As deceased stopped his car in response to the call, he heard a shot across the street. Turning in the direction of the street, he saw Walter Clements falling to the ground, firing his gun as he fell. Several more shots were fired. Appellant was going around an automobile with a shotgun in his hand. Appellant reached in his car and got another shotgun. Deceased's pistol was not loaded. He loaded it, and, pointing it in the air, said to appellant: "Drop your gun." Instead of dropping his gun, appellant fired at deceased. Deceased returned the fire. Appellant crouched and advanced across the street, firing at deceased as he came. Deceased moved in front of an automobile and appellant came in behind the car. Deceased backed towards the center of the street, and, as he did so, appellant shot him again, and deceased fell to the ground mortally wounded. Immediately after appellant shot Clements and deceased he (appellant) said: "I will learn the s—s of b—s they can't do me that way." The foregoing facts came from witnesses for the state and from the dying declaration of deceased.

Touching the difficulty between appellant and Clements, witnesses for the state testified that appellant had called Clements to his automobile; that Clements was standing with his arms on the car talking to appellant when they noticed him jump back from the car; that Clements ran behind the automobile as appellant got out of the car with a shotgun in his hand; that as appellant got out of the car with a shotgun Clements fired at him; that appellant immediately returned the fire; that each of the parties fired about three shots; that Clements fell back on the curb mortally wounded.

A witness for the state testified that shortly before the homicide appel-

lant came to his place of business and got two 12-gauge shotguns and a box of shells; that appellant loaded one of the guns while in the shop; that he carried both guns away with him, as well as the box of shells; that appellant said he was going hunting.

Deceased died from the effects of the wounds he had received at the hands of appellant approximately ten days after the difficulty. It appears that Clements died shortly after he was shot.

Appellant testified, in substance, as follows: He served at the front during the World War. The hardships he had undergone had impaired his health and to a great extent shattered his nerves. He had developed tuberculosis. On account of his disability the government paid him increased compensation. Deceased and Walter Clements had taken his gun from his automobile and had later arrested him without producing a warrant of arrest. Although he had had a few drinks of intoxicating liquor he was not intoxicated. The officers placed him in jail and refused to let him out until next morning. During the time he was in jail he was unable to take any nourishment except milk. He procured some medicine from a doctor to quiet his nerves while he was incarcerated. Upon being released from jail he requested deceased and Clements to carry his gun back and put it in his automobile. The officers declined to place the gun in the automobile and he told them that if a prominent man had been in the same situation they would have returned the gun to him. Deceased told him that he was a G— d— liar. He later went back to the city hall and requested the officers to place his gun in his automobile. Again, he told the officers that they would have placed the gun in the car if he (appellant) had been a prominent man. The officers again refused to place the gun in the car. Deceased asked him (appellant), "What are you going to do about it?" He replied: "Bill (deceased), don't consider this no threat. I am not physically able to fight you, but don't think I am afraid of you, if I was as fixed as you are." Deceased replied: "You G— d— s— of a b— you can go and get fixed." Deceased was armed at the time. He (appellant) drove away. Going to his home he procured three guns, two single barrel shotguns and a .22 target. One of these guns had the barrel broken off and the other had the barrel cut off. He then went to the telephone to see if he could get deceased. He did not intend going to deceased again unarmed. Hence he went to a place of business in town and procured two shotguns, his purpose being to protect his life if necessary, and, further, to protect himself against abuse on the part of deceased. He again tried to get deceased on the telephone, his purpose being to have deceased return him his shotgun and further to demand an apology that he thought deceased owed him, for calling him a s— of a b—. Going up the street in his car looking for deceased, he saw Walter Clements. Stopping his car, he called to Clements and asked him where deceased

was. Clements replied that he did not know. Further, Clements said: "What are you going to do about it?" At this point Clements jumped back from the automobile and as he did this he (appellant) saw deceased in the center of the street. Deceased had a gun in his hand pointing it in his direction. He got out of the automobile with a shotgun. Clements came up from the rear of the car and fired a shot at him. He returned the shot. Clements fired a second shot, and he also fired again. After he had shot Clements he turned and faced deceased. Deceased had his gun in his hand at the time, but he was unable to fire at him on account of people walking along the street. Deceased fired at him, and hid behind a car. He went across the street toward deceased, firing a shot at him. He shot deceased because he believed his life was in danger. He (appellant) was wounded. Touching his mental condition at the time he fired the fatal shot, appellant testified as follows: "That medicine (referring to the medicine he had taken while in jail) didn't make me sick then and it didn't make me crazy. I knew what I was doing. I knew all I was doing all the time from Thursday to Friday. I wasn't out of my mind any time Thursday to Friday. My reasoning faculties were with me and I was conscious of what I was doing all the time."

Witnesses for appellant testified that deceased drew his pistol and pointed it at appellant before appellant fired at him. Some of appellant's witnesses testified that they saw appellant shortly before the homicide and observed his demeanor and heard him talk, and that, in their opinion, he was temporarily insane and did not know the difference between right and wrong.

In his first application for a continuance appellant alleged that he was not ready for trial on account of the absence of his mother. It was averred that the witness was too ill to attend court although she had been duly summoned to appear and testify. It was further averred that appellant's mother would testify, if present, that she saw appellant a short time after he had been released from the city jail and before the homicide; that at that time he was extremely nervous and highly agitated, and, in her opinion, was temporarily insane. It was alleged in the application that appellant had lived at home with his mother since his service in France during the World War, and that his mother knew of his impaired health and nervous condition due to hardships endured overseas; that she also knew that he had tuberculosis, on account of which he was receiving extra compensation from the federal government. The state resisted the granting of the application, and presented the affidavit of a physician who had examined the witness on the day of the trial. In his affidavit it was stated by the physician that the witness was able to be in attendance upon court and testify in the case. It appears that this statement was sworn to before private prosecutor. On the motion for a new trial appellant attached the affidavit of his mother, which supported

the averments embraced in the application for a continuance. Appellant made a motion to strike out the affidavit of the physician on the ground that it was not in legal form, but did not specifically object on the ground that it was taken by private prosecutor. On the hearing of the motion, appellant offered the testimony of witnesses to the effect that his mother had been too ill to attend court. In qualifying the bill of exception relating to the overruling of the application for a continuance and the denial of the motion for a new trial, the court stated that he considered the affidavit of the physician to the effect that the witness was able to attend court. Our view of the question presented makes it unnecessary to determine whether the trial court was warranted in considering the affidavit of the physician.

It is observed that appellant said while testifying: "I was not out of my mind at any time Thursday or Friday (the day preceding the homicide and the day of the homicide). My reasoning faculties were with me and I was conscious of what I was doing all the time." A witness for appellant testified that he had observed appellant immediately prior to the homicide and that his eyes looked like glass. He said: "In other words he looked to me like a madman. He just stared and turned back around and faced toward Mr. Johns." Two of appellant's neighbors testified to having come to appellant's home shortly before the homicide and seeing appellant there. These witnesses said that appellant had "a very wild blank look." They testified, further, that he did not appear to be in his right mind, and that, in their opinion, he was not of sound mind at the time. One of the witnesses said: "I never did in my life see anybody under that mental stress before or in that condition. As far as the expression on Frank's (appellant's) face was concerned, it was absolutely blank. His eyes were expressionless." It was on this occasion that appellant averred in his application for a continuance that his mother was present. It was on this same occasion that the mother formed her opinion, as alleged in the application and in the affidavit of the mother, that appellant was temporarily insane and did not know the difference between right and wrong. Other witnesses for appellant testified to having served overseas with him in the front line trenches. They described the hardships underdone by soldiers who fought at the front. Appellant described to the jury his symptoms of ill health and the extent of his nervousness, and declared that he was suffering from tuberculosis resulting from his service overseas. The testimony of appellant's mother would have been but cumulative of that given by other witnesses on the trial. There was no contention made in the trial of the case that appellant was permanently insane. The testimony merely raised the issue that his mind was incapable of cool reflection, and, further, that he was temporarily insane at the time he fired the fatal shot. As heretofore stated, appellant's own testimony contradicted the testimony raising the

issue of temporary insanity. In passing on the motion for a new trial, the trial judge considered the absent testimony in the light of the facts heard upon the trial. He had heard appellant detail the circumstances leading up to the homicide, and describe the difficulty he had with deceased and Clements. Further he had heard appellant's neighbors describe appellant's mental condition, and express the opinion that appellant was temporarily insane. He knew that appellant had told the jury that shortly prior to, and on the occasion of the homicide, his reasoning faculties were normal and he was conscious of what he was doing at all times. In the light of these facts, the question for determination was, whether, viewed in the light of the facts adduced upon the trial, the absent testimony was of such materiality as it would likely produce a different result upon another trial.

It is true that the trial court's discretion to determine the probable truth of the absent testimony did not operate in view of the fact that her affidavit, in which it was shown that she would testify to the facts averred in the application for continuance, was attached to the motion for new trial. Wiley v. State, 117 Texas Crim. Rep., 449, 36 S. W. (2d) 495. However, as said in White v. State, 90 Texas Crim. Rep., 584, 236 S. W., 745, this should not be understood to necessitate a new trial unless the materiality of the absent testimony be such as that it would likely produce a different result upon another trial. Moreover, it was said in the same connection that it would not necessarily result in the granting of a new trial when there was other evidence cumulative of the absent testimony present or available to the appellant so that it reasonably appeared that no injury resulted in the absence of such testimony. See, also, Walton v. State, 116 Texas Crim. Rep., 20, 34 S. W. (2d) 598, and Wiley v. State, supra. In the state of the record we are unable to reach the conclusion that in overruling the motion for new trial an abuse of discretion is shown.

In his motion for a new trial appellant alleged that the jury, after retiring to deliberate on the case, received other testimony. The specific complaint was that the juror Mask stated to another juror that he knew appellant's witness Clyde Argo, and that he was not worthy of belief and that he (the juror) would not believe him on oath. The state controverted this ground of the motion and presented the affidavit of the juror in which he denied that he had stated in the jury room to any juror that he was acquainted with the witness Clyde Argo. It was further stated in the affidavit that the statement the juror made was that personally he would not believe Argo on oath. On the hearing of the motion the juror to whom it was alleged that the statement was made testified that, after the jury had decided that appellant was guilty, the juror Mask stated to him thta he knew the witness Argo and would not believe him on oath. This juror testified further that this statement had something

to do with him agreeing to a penalty of 99 years. The court, in approving the bill of exception, stated that he took into consideration the affidavit of the juror Mask to the effect that he did not make the statement attributed to him, but only said that he would not believe the witness Argo on oath. None of the other jurors was called.

Subdivision 7 of article 753, C. C. P., provides that a new trial shall be granted in cases of felony where the jury, after having retired to deliberate upon the case, have received other testimony. Information given by one of the jurors to the others is new and other testimony within the meaning of the statute. Holland v. State, 107 Texas Crim. Rep., 582, 298 S. W., 898, and authorities cited. Where, after retirement, the jury receive other evidence damaging to the appellant, the presumption of injury will obtain. Holland v. State, supra. In the present case the affidavit of the juror Mask and the testimony of the juror who claimed that the misconduct occurred is conflicting. In his Annotated Penal Code, sec. 574, Mr. Branch states the rule as follows: "Where the alleged misconduct is made the subject of diligent investigation by and under the direction of the trial judge and settled in behalf of the State upon conflicting evidence, the decision of the judge will be given as much consideration on appeal as would be given to the verdict of a jury on any other question of fact, and if there is sufficient evidence to justify the action of the trial judge his decision thereon will not be disturbed on appeal unless clearly wrong."

Under the present record, the trial judge was warranted in concluding that the jury did not receive other testimony. Neaves v. State, 112 Texas Crim. Rep., 293, 16 S. W. (2d) 246, and authorities cited. In discussing the credibility of the witness Argo, it was not improper for the juror to state that he did not believe his testimony. That this was the extent of his reference to the witness was maintained by the juror in his affidavit.

Further, appellant alleged in his motion for a new trial that a prejudiced juror had sat in the trial of the case. It was averred that this juror had stated, prior to the trial, in substance, that appellant should receive the death penalty and that if he got on the jury he would send him to the electric chair. Again, expressions on the part of the juror made after the return of the verdict indicating prejudice were alleged. In support of the motion, the affidavits of those to whom it was alleged that the statements were made were attached to the motion for a new trial. The state controverted this ground of the motion and presented the affidavit of the juror in which he expressly denied that he had made the statements attributed to him. He denied, further, that he had any prejudice against appellant. Appellant called to the stand on the hearing the two witnesses to whom it was alleged that the statements were made. In approving the bill of exception relating to the matter, the

court stated that he took into consideration the affidavit of the juror denying that he made the statements. In Branch's Annotated Penal Code, sec. 565, p. 288, the rule is stated as follows: "When it is sought to show on the hearing of the motion for new trial that a juror before the trial had expressed an opinion of defendant's guilt or had made statements which showed a prejudice against defendant, the decision of the trial court on that issue will be sustained by the appellate court unless clearly wrong if the evidence bearing thereon was conflicting and was sufficient, if believed, to justify the action of the trial judge."

See, also, McKenzie v. State, 116 Texas Crim. Rep., 395, 11 S. W. (2d) 172; Meadors v. State, 101 Texas Crim. Rep., 336, 275 S. W., 829. We are constrained to hold that there was no abuse of discretion on the part of the trial court in reaching the conclusion that the juror was not prejudiced.

A careful examination of all of appellant's contentions leads us to the conclusion that error is not presented.

The judgment is affirmed.

*Affirmed.*

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

ON MOTION FOR REHEARING.

HAWKINS, JUDGE.—Appellant's motion for rehearing and the written and oral argument in support thereof have been carefully considered. We discover nothing leading us to believe our original disposition of the case was wrong.

The motion for rehearing is overruled.

*Overruled.*