# I. W. Friedsam v. The State.

No. 19568.  Delivered April 6, 1938.
Rehearing denied May 18, 1938.

The opinion states the case.

*H. S. Beard* and *Coy Barrett,* both of Waco, and *Leonard Gorin,* of Tyler, for appellant.

*Holvey Williams,* Criminal District Attorney, and *Willard McLaughlin,* Special Prosecutor, both of Waco, and *Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

GRAVES, JUDGE.—The appellant was convicted of murder with malice, and punishment fixed at fifty years confinement in the penitentiary.

It seems that appellant had hired a taxi driver, Ivan Cohen, in the city of Waco, to drive him around in a taxicab on August 19, 1936. After about an hour's driving around the city of Waco, and upon a return to appellant's home, he had an argument with the cab driver, and refused to pay the bill. The driver finally phoned to the police department, and officers Murphy and Baskin were sent to appellant's home. They drove up in their car and Cohen approached them and told them his version of the dispute, and they got out of their car, which was parked in the street, and started toward appellant's house. Cohen's car was parked in the driveway, with the lights burning (it being nighttime) and the officers, dressed in their uniforms, approached the house, not a word being spoken by anyone; just as officer Baskin came around the back of the cab, the taillight being a white one, he was in plain view of the house, and was near its side entrance, between fifteen and thirty feet from the house, and at this point a shot was fired from inside the house and through the door screen, and officer Baskin fell, his body having received a number of shot, probably BB's, around the navel, and from these wounds he died on August 28, 1936. The witness Murphy, the brother officer of the deceased, testified: "At that time [as they approached the house] neither Mr. Baskin nor I had drawn our guns. We were just calmly walking towards the house before that shot was fired from the house that hit Mr. Baskin. Up to that time I had not heard anything from the house. There wasn't a sound. There had been no request coming from the house for us not to approach it. I heard no sound whatever. We had not made any threatening gestures to do anybody any harm at that time. We had merely answered the call out there under our instructions that we had received, and were walking calmly toward the house to see what could be done about it."

That the appellant knew that the police had been summoned is clear, because he had heard the witness Cohen phone to them. That he saw them when they were thus approaching the house is equally clear, and saw them plainly enough to kill one of them by shooting from behind a screen door, thus undoubtedly knowing that they were officers whose presence had been requested there.

Appellant's only exception to the court's charge is a complaint that nowhere therein does it "Charge the jury the law with reference to an unlawful and illegal arrest," and to the

same effect is his bill of exceptions No. 3, which charge was refused by the trial judge with the following qualification: "Refused for the reason that I did not consider that the evidence as a whole raised the issue of unlawful arrest, or justified such charge, taking into consideration the main charge," and to the same effect is appellant's bill of exceptions No. 4; also his bill No. 5, which is a statement of the law relative to a peace officer's right to arrest without a warrant; also to the same basic effect is bill No. 6, with the exception that it is a charge seeking to reduce the grade of the homicide to murder without malice, provided appellant thought at the time of the shooting that such officers were attempting to illegally arrest him. All of said bills have the same qualification by the trial judge.

It is our opinion that the trial judge was correct in his qualification when he said that the evidence did not call for any such charge, nor was appellant entitled to defend on such ground. There was no threat of any arrest; he knew the officers had been called, and they were in his plain view, calmly walking towards the house; they said nothing to him, and he said nothing to them; he knew they were peace officers, and with not a word of warning he shot one of them, thereby causing his death. These two men were there for his protection as well as for the protection of all the public, and to hold that the fact of their mere presence, coming towards a man's house, would constitute a threat to cause an illegal arrest,—would be beyond the bounds of reason, and contrary to all the philosophy of our modern system of law enforcement. The appellant did not take the stand, and the only way we could find a reason upon which to base his requested instruction would be contrary to all human experience, reason and training. It would furnish a precedent that would certainly be dangerous to the lives and safety of police officers to say that when one having been called to come to certain premises, that, under fear of an illegal arrest, one lawfully on the premises had the right to kill such police officer, would be destructive of the protection that the public has a right to expect from its peace officers.

Appellant further complains in his bill of exceptions No. 2 of the following: While the appellant's attorney was questioning Sam Fuller of the identification bureau of the City of Waco, and had requested the production of a certain picture of the appellant taken after his arrest hereunder, the county attorney produced another card than the one which was inquired about, and said: "Here is his complete record, Mr. Beard, if you want it," claiming that thereby he conveyed and intended to convey to the jury that appellant had a long criminal record. The court

qualifies this bill, in substance, showing that the evidence proffered by the county attorney was an identical copy of the picture offered in evidence on one side, and on the other side there were the fingerprints of appellant and some writing, but the court certifies that the reverse side of the picture was not shown to the jury, and that they had no chance to see anything on such reverse side, and further the court instructed the jury not to consider such statement for any purpose. We see no error reflected herein.

A further question is presented in appellant's motion for a new trial in which he alleges misconduct on the part of juror Ed. Williams, wherein such juror was alleged to have said, in the presence of A. S. Taylor, that he was on the venire to try appellant, and he knew that both sides would take him, and that appellant had gotten fifty years in his other trial, and that is what he ought to have this time. Mr. J. P. Julian testified, in substance, that on Friday or Saturday, before the trial on Monday, the juror Ed. Williams, in the lobby of the Savoy Hotel said that he was on the jury venire to try appellant, and that he believed appellant's attorney would take him on the jury, and "He says well he got fifty years the other time and I believe he ought to have fifty this time." This conversation was denied by the juror, and a conversation was testified to by Les Johnson in which Williams and Julian were talking relative to this trial, preceding the day of the trial in which the witness said "All I heard was Ed Williams said both sides wouldn't have him. Ed Williams said neither side would take him. He said all of you knew him and wouldn't have him. He said all the lawyers on both sides knew him and neither side would take him."

The foreman of the jury, Mr. Royalls, was sworn and testified, in substance, that after the jury began to deliberate they first voted guilty, and not insane, neither permanent nor temporary, unanimously; then deliberated on the punishment. The first vote was on fifty years punishment; six voted therefor and six did not vote at all. Then the complained of juror Ed. Williams suggested voting on five years, but he received no second to such suggestion; he was the only one doing the talking; he then sat there a few minutes, and he then offered to vote on ten years, and nobody said anything; then in a few minutes he said: "Well, let us vote on fifteen years,"—then he raised it to twenty-five, and they voted on the twenty-five, and got two votes on that amount, Mr. Williams and another voting therefor. No vote was taken for about twenty minutes. They kept on talking and discussing the number of years. So finally Williams wanted to vote again, "kept on bidding up," and finally got up to forty

years, and nobody voted on the forty, and finally they voted again on fifty, and eleven voted for fifty, and Mr. Williams did not vote. Then they sat around awhile waiting for him to change his mind or make a suggestion. Williams then said: "Well, we will just stay here awhile," and they started to play dominoes, and when they had gotten the dominoes poured out and ready to play Mr. Williams said: "Mr. Royalls, gets your charge and write the fifty years," and they then took another vote and all voted for fifty years.

The trial judge saw the witnesses, heard them testify in this matter and overruled the motion for a new trial. In so doing we think he was acting within his discretion. We quote Branch's Ann. P. C., Sec. 565, p. 288, as follows: "When it is sought to show on the hearing of the motion for new trial that a juror before the trial had expressed an opinion of defendant's guilt or had made statements which showed a prejudice against defendant, the decision of the trial court on that issue will be sustained by the appellate court unless clearly wrong if the evidence bearing thereon was conflicting and was sufficient, if believed, to justify the action of the trial judge," citing a long line of cases.

From Meadors v. State, 101 Texas Crim. Rep. 336, 275 S. W. 829, we quote: "Where there is a controversy raised as to this character and kind on motion for a new trial, and the trial court hears the testimony, his decision is not reversible under such circumstances, and is only reversible when the testimony is all one way, or when the decision is clearly wrong." See McKenzie v. State, 11 S. W. (2d) 180; Bracken v. State, 51 S. W. (2d) 379.

We are not in such a position that we can say that the trial court's refusal of a new trial, on account of the matters complained of relative to the juror, is clearly wrong; in fact we are convinced that the court was right in refusing such new trial under the law and the decisions thereunder. The juror's denial of making such statements; his conduct in the jury room, being always the low man in voting the punishment,—goes far to satisfy our minds that the trial court's judgment was a correct one; and believing that this case has been fairly tried, and that appellant has had the benefit of all his legal rights, this judgment is affirmed.

### ON APPELLANT'S MOTION FOR REHEARING.

CHRISTIAN, JUDGE.—After a careful re-examination of the record in the light of appellant's motion for rehearing we are

520

constrained to hold that reversible error is not presented.

The motion for rehearing is overruled.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.